## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **Criminal No.  ELH-13-00342** |
| **LYNDON FACISCO MILLER** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

...o0o...

## GOVERNMENT'S CONSOLIDATED RESPONSE
## TO DEFENDANT'S PRE-TRIAL MOTIONS

Now comes the United States of America by its attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland, and Christopher J. Romano, Assistant United States Attorney and responds in opposition to the Defendant's Pre-Trial Motions.

## I.    FACTUAL AND PROCEDURAL SUMMARY OF THE CASE

On June 26, 2013, a federal grand jury returned a seven count indictment in the above-captioned matter.  Count One charged that from in or about May, 2013, and continuing through in or about June, 2013, in the District of Maryland and elsewhere, Lyndon Facisco Miller (hereinafter Defendant), Sophia Lorraine Warmington, (hereinafter Warmington) and others known and unknown to the grand jury conspired to distribute and possess with intent to distribute 1 kilogram or more of heroin, a Schedule I narcotic controlled substance, 500 grams or more of cocaine, a Schedule II narcotic controlled substance, and 28 grams or more of cocaine base, "crack" cocaine, a Schedule II narcotic controlled substance, all in violation of 21 U.S.C. §§ 841(a)(1) and 846.

Count Two charged that on June 22, 2013 the Defendant and Warmington did knowingly, intentionally and unlawfully possess with the intent to distribute 100 grams or more of heroin, 500 grams or more of a cocaine and 28 grams or more of cocaine base, commonly known as "crack" cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Counts Three, Four and Five, charged the Defendant with distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Six charged the Defendant with possession of a loaded firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Count Seven charged the Defendant with being a felon in possession of a loaded firearm, in violation of 18 U.S.C. § 922(g)(1).

On February 10, 2014, Warmington pled guilty to Count One, as amended, and is awaiting sentencing.

On May 12, 2014, the Defendant filed the following motions: (1) a motion to suppress evidence obtained by electronic surveillance and intterception (sic); (2) a motion to suppress evidence obtained by or derived from GPS installation and monitoring; and (3) a motion to suppress tangible evidence.

For the reasons set forth below, the Defendant's motions should be denied.

## II.    ARGUMENT

### (A)    The Wire Tap Evidence Was Properly Obtained.

The Defendant argues that the wiretap recordings must be suppressed because (i) data obtained from a pen register and trap and trace order was facially defective; (ii) the orders were based on affidavits that lacked probable cause; (iii) the monitoring agents failed to properly minimize calls; (iv) the investigators failed to exhaust other investigative procedures; and (v) the wiretap orders constituted general warrants.

(i) *The Pen Register And Trap And Trace Order Was Not Facially Defective*.

The Defendant first argues that the pen register and trap and trace order signed by Judge William O. Carr on May 2, 2013, was facially defective because, notwithstanding that both the application and most of the contents of the order refer to the Defendant, Lyndon Miller, a typographical error in the first part of the order, erroneously referred to a different individual, Dwight Narcis.  This typographical error, according to the Defendant, is not only "illustrative of the lack of care and attention to detail," Defendant's motion at 4, but comprises a fatal flaw to "support probable cause for the issuance of a search warrant or wiretap order."  *Id.*  Ironically, the same lack of care and attention to detail exists in both the Defendant's motion to suppress electronic surveillance and intterception" (sic) and his motion to suppress evidence obtained by or derived from GPS, as the Defendant's motions in both instances attach incorrect exhibits, necessitating in one case the filing of a Motion to Amend/Correct (Document 77), as well as the failure to attach a correct Attachment C to another of his motions.  Defendant's oversight in these matters simply demonstrates that virtually everyone, investigators, counsel (and even judges on rare occasion) can and do make mistakes.

The affidavit in support of the order clearly and repeatedly makes reference to the Defendant, Exhibit 1, as does that portion of the order which states "[t]he pen register and trap and trace device is to be applied in the vicinity of **Lyndon Miller** to determine the number or other identifier of **Lyndon Miller** telephone(s)."  Exhibit 2.  (Emphasis in the original).

While the Government acknowledges that a typo regarding the name Dwight Narcis appears in the beginning of the order, it is just that-a typo.  In no way does it detract from the probable cause in support of the wiretap affidavit.  Exhibit 3.  *See United States v. Bynum*, 165 F.3d 161, 165 (4th Cir. 2010) (disregarding typos relating to dates of uploads, and explaining that "[r]egardless of the dates of the uploads, the affidavit plainly established a 'fair probability'

that a search of the premises might uncover evidence of possession and transmission of child pornography"); *cf. Illinois v. Gates*, 462 U.S. 213, 235-236 (1983) (affidavits should not be discarded for technical reasons).

Moreover, even assuming that the information derived from the pen register and trap and trace was excised from the affidavit, there nevertheless existed ample probable cause to establish the basis for the issuance of the wiretap affidavit for the reasons set forth below.

> (ii)     *The Affidavits In Support Of Interception Of The Defendant's Cellular Telephones Set Forth Ample Probable Cause.*

Section 10-408 of Maryland's Courts and Judicial Proceedings Article outlines the procedural requirements and the factual determinations that must be made for a lawful wiretap order to issue.  Among other requirements, before issuing an order allowing the interception of wire or electronic communication, judges of the Circuit Court for the State of Maryland are required to determine whether on the basis of the facts submitted by the applicant:

- there is probable cause for belief that an individual is committing, has committed or is about to commit a particular offense enumerated in §10-406 of this subtitle;[1]

- there is probable cause for belief that particular communications concerning that offense will be obtained through the interception of communications over the targeted communication device; [and]

- there is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense.

Md. Code Ann., Cts. & Jud. Proc. § 10-408 (c).  *See also*  18 U.S.C. § 2518(3)(d) which provides three alternative bases for establishing probable cause for interception of electronic communications: (1) that the target facilities are being used or are about to be used in connection with an enumerated offense; or (2) that the target facilities are leased to or listed in the name of

---

[1] To include controlled substance violations.

an individual believed to have committed an enumerated offense; or (3) that the target facilities are commonly used by an individual believed to have committed an enumerated offense.

The existence of probable cause is determined by looking at the "totality of the circumstances." *Gates*, 462 U.S. at 235-36.   Probable cause exists where the totality of the circumstances reveal that there is a fair probability that the wiretap will uncover evidence of a crime.   *United States v. Fairchild*, 189 F.3d 769 (8th Cir. 1999).   Furthermore, the probable cause required for the issuance of a wiretap order is the same that is necessary to obtain the issuance of a search warrant.   *United States v. Talbert*, 706 F2d. 464, 467 (4th Cir. 1983); United *States v. Falcone*, 505 F.2d 478, 481 (3rd Cir. 1974).   "In applying for an order authorizing interception of electronic communications it is not necessary for the applicant to prove beyond a reasonable doubt that the communications concerning the offense will be obtained, but only that there is a fair probability thereof."   *United States v. Depew*, 932 F.2d 324, 327 (4th Cir. 1991) (Emphasis added).   Only the probability and not a prima facie showing of criminal activity is the standard of probable cause.   *United States v. Lyons*, 507 F. Supp. 551, 555 (D. Md. 1981).

"Applications for electronic surveillance orders, like search warrants, are to be read 'in a common sense and realistic fashion.' ... Assessments concerning probable cause are to be made after the 'totality of the circumstances' test has been used to determine the adequacy of the application."   *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985) (citations omitted).

It is axiomatic that such affidavits "must be tested and interpreted by magistrates in a common sense and realistic fashion . . . Technical elaborate specificity once exacted under common law pleadings have no proper place in this area."   *United States v. Ventresca*, 380 U.S. 102, 108 (1965).   "It is sufficient that the information in the affidavit, when assessed in its totality, was sufficient to support a reasonable belief that evidence of criminality by the subject

of surveillance would be obtained." *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir.

1988). When an issuing judge makes a finding of probable cause, a reviewing court should not

review that decision in a "hypertechnical, rather than common-sense manner." *Ventresca*, 380

U.S. at 109. A reviewing court is not to substitute its judgment as to probable cause, but need

only determine whether there was a substantial basis for the issuing court's determination of

probable cause. *Gates*, 462 U.S. at 238-39.

The affidavit for the initial wire, Exhibit 3[2], sets forth detailed evidence of narcotics

trafficking and the use of target facilities to conduct the narcotics trafficking. *See* Exhibit 3 at

10-21, 24-34. On May 6, 2013, Harford County Circuit Court Judge Angela Eaves signed an

order authorizing interception of cellular telephone numbers utilized by the Defendant.[3]

In analyzing a motion to suppress the wiretaps, two additional principles are important.

First, the burden is on the defendant challenging the electronic surveillance to show illegality.

*United States v. Matlock*, 415 U.S. 164, 177 (1974); *see also* Fishman and McKenna,

*Wiretapping and Eavesdropping*, § 23.5 (rule that party seeking suppression of evidence has

burden of proof by preponderance that evidence was illegally seized should govern motion to

suppress eavsdropping evidence). Likewise, the Supreme Court has held that in a close case a

reviewing court should resolve doubts in favor of upholding a search warrant. *Ventresca*, 380

---

[2]  In his motion to suppress the wiretap, Defendant references "Attachment C", at FN4, as the affidavit filed by Detectives Penman and Gregory in support of the wiretap. In point of fact what the Defendant appended at "Attachment C" was not the wiretap affidavit, but an affidavit in support of a search warrant. Government's Exhibit 3 is the actual wiretap affidavit.

[3]  Judge Eaves subsequently signed orders related to additional phones utilized by the Defendant on May 6, 2013, June 4, 2013, and June 5, 2013. Those orders were supported by affidavits as well. Copies of those affidavits and orders were provided as part of discovery to defense counsel. They will not be reproduced here.

U.S. at 109; *see also United States v. Lofton*, 518 F. Supp. 839, 843 (S.D.N.Y. 1981), aff'd.

without op., 819 F.2d 1130 (2d Cir. 1987).

The second principle is that the "determinations by an issuing judge are accorded

substantial deference" when reviewing wiretap orders. *United States v. McKinney*, 785 F. Supp.

1214, 1220 (D. Md. 1992). In *McKinney*, Chief Judge Black further explained:

> The function of this Court, which is essentially reviewing the previous
> findings of [the issuing judge], is "not to make de novo determinations of
> sufficiency as if it were [an issuing judge], but to decide if the facts set
> forth in the application were minimally adequate to support the
> determination that was made." *United States v. Scibelli*, 549 F.2d 222,
> 226 (1st Cir. 1977).

By all of the evidence the affidavit, Exhibit 3, articulated facts that led the issuing judge

to conclude that :

    a.    Miller, Warmington (and others) were involved in the trafficking of
controlled substances;

    b.    had used and would continue to use the targeted phones in furtherance of
those crimes; and

    c.    evidence of those crime would be obtained if communications  made over
the targeted phones were intercepted.

Therefore, there was probable cause to issue the order(s) for the interception of

communications over the targeted cellular telephones, and Judge Eaves did not err in concluding

that probable cause existed to support her issuing the wiretap orders. Accordingly, the intercepts

were proper.

> (iii)    *There Was No Violation Of The Court's Minimization
> Requirements.*

The Defendant next complains that the investigators failed to comply with the

minimization requirements under both Md. Cts. & Jud. Proc. § 10-408 and 18 U.S.C. § 2518(5).

Judge Eaves's order explicitly stated that monitoring of conversations was to cease when it was

determined that the conversations were unrelated to communications subject to interception

under Title 18 of the United States Code.  *See* Exhibit 4 at 6.  In addition, Judge Eaves's order

made reference to minimization guidelines, which had been approved by the Court.  Exhibit 4 at

7.  A copy of those minimization guidelines, Exhibit 5, provided that for the first 3 days, all calls

intercepted would be both monitored and recorded during the first three minutes, after which

spot monitoring and minimization would be required.  This procedure facilitated identification of

voices and enabled plant operators to recognize patterns of conversation.  After the first three

days, plant operators were required to consider the previously established patterns of

conversations, the identities of the conversants in order to determine when a conversation was of

a non-pertinent nature and spot monitoring and minimization were to be utilized prior to three

minutes.[4]

While the Defendant complains that there was a failure to minimize, in point of fact there

was not.  The minimization requirement does not leave all innocent communications unheard.

Unnecessary intrusions are to be reduced as much as possible but efforts at minimization must be

reasonable under the circumstances and reviewed on a case-by-case basis when testing

compliance.  The Fourth Circuit indicated the rule for this circuit in *United States v. Clerkley*,

556 F.2d 709 (4th Cir. 1977):

> In analyzing a given case, the federal courts have considered three
> principal factors:  (1) the nature and scope of the alleged criminal
> enterprise; (2) the government's reasonable expectation as to the content
> of, and parties to, the conversations; and (3) the degree of judicial
> supervision while the wiretap order is being executed.

*Id.* at 716.

While *Clerkley* involved the investigation of illegal gambling, these same factors are

applicable to a narcotics conspiracy.  In *Clerkley*, the Fourth Circuit observed: "When law

enforcement officials are confronted with a large, far-flung and on-going criminal activity

involving multiple parties, they are afforded greater latitude in conducting wiretaps." *Id.*  The

---

[4] In point of fact, as is typical in drug-related conversations, virtually, none of the calls exceeded
three minutes.  *See e.g.*  Exhibit 6, which is a representative printout for one of the intercepted
lines.

Seventh Circuit, in considering a drug conspiracy, held that "[l]arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far-flung conspirators and to delineate the contours of the conspiracy." *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975).

According to the minimization guidelines in place, agents were permitted to listen to or spot monitor calls that were less than three minutes in duration. In not every instance will the conversants immediately launch into a discussion about narcotics. As such, the monitors are permitted, even in calls that were initially minimized, to listen further to determine whether or not the conversation continues to be that which would be non-pertinent to the investigation. As the Eighth Circuit in *United States v. Cox*, 462 F.2d 1293 (8th Cir. 1972) noted:

> [W]here as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value.

*Id* at 1300-01.

Indeed, it is impossible to determine at the outset whether a particular conversation is irrelevant until it has been terminated. "It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction a conversation will take." *United States v. LaGorga*, 336 F. Supp. 190, 196 (W.D. Pa. 1971).

Because there is no inflexible rule to determine reasonableness, many circumstantial factors must be considered, including the number of short calls intercepted, whether the surveillance target is part of a widespread conspiracy, what type of telephone line is being

monitored, at what point in the investigation the interception took place, and whether the conversation being intercepted is ambiguous. *See Scott v. United States* 436 U.S. 128, 140-42 (1978). Several of the factors recognized in the case law are germane to this case.

First, when an investigation involves a drug ring of unknown proportion, "the need to allow latitude to eavesdroppers is close to its zenith." *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000). Compared to a single criminal episode, "[l]arge and sophisticated narcotics conspiracies may justify considerably more interception." *Quintana*, 508 F.2d at 874. Allowing leeway is especially important when "the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped." *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1989); *see also United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir. 1994).

In this case, at the time the wiretaps began, investigators knew the Defendant was using the target telephones in furtherance of his drug trafficking activities. There, however, were many unknowns. At the outset investigators did not know the sources of supply for the heroin and cocaine. On a more fundamental level, in many instances investigators did not know the identities of numerous co-conspirators that were obtaining narcotics.

 The call volume was high. Furthermore, as reflected in Exhibit 6, the calls generally were short, less than three minutes in duration, including ring and connection time. Moreover, co-conspirators rarely referred to one another by their legal names. Rather, agents had to keep track of street names often used by apparent participants in the illegal activity who also were using cellular telephones subscribed to fictitious persons or third parties. The contents of the intercepts themselves posed additional complicating factors. Courts have recognized that when conspiracies utilize "codes and specialized jargon, making criminal conversations more difficult to detect and decipher, there is yet [another] reason for affording investigators some leeway."

*United States v. Uribe,* 890 F.2d 554, 557 (1st Cir. 1989); *see United States v. Sanchez*, 961 F.2d 1169, 1179 (5th Cir. 1992); *Daly,* 535 F.2d at 441.

Additionally, monitored conversations occasionally started with discussion of non-criminal matters, a fact that does "not require the government to plug its ears." *United States v. Wilson*, 835 F.2d 1440, 1445 (D.C. Cir. 1987), *abrogated on other grounds by Bloate v. United States*, 130 S. Ct. 1345 (2010); *see also United States v. Mansoori*, 304 F.3d 635, 645 (7th Cir. 2002). Because participants in a conspiracy may "often discuss[] personal and criminal matters in the same conversations," *Wilson*, 835 F.2d at 1445, it is unreasonable for monitoring agents to cease monitoring every time non-criminal matters are mentioned.

Furthermore, according to Judge Eaves's order, Exhibit 4 at p. 7, one of the affiants was required to submit progress reports to her. With respect to the extent of judicial supervision, "[w]here the authorizing judge has required and reviewed ... reports at frequent intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted." *United States v. Armocida*, 515 F.2d 29, 44-45 (3rd Cir. 1975) (citing *United States v. James*, 494 F.2d 1007, 1021 (D.C. Cir. 1974)); *see also United States v. Cleveland*, 964 F. Supp. 1073, 1093 (E.D. La. 1997). These reports, Exhibit 7, advised the judge of statistical data including the total number of activations, the number of completed calls, as well as the number of pertinent calls. The reports also included descriptions of many of the pertinent calls, which provided Judge Eaves with continuing probable cause to support the ongoing interceptions. Every report ended with an "Authorization" that Judge Eaves signed to confirm her review of the report and her agreement that continued interception was warranted. Accordingly, the degree to which Judge Eaves supervised these wiretaps ought to inform the Court's assessment of the reasonable efforts to minimize. *See United States v. Eiland*, 398 F. Supp. 2d 160, 175 (D.D.C. 2005).

In assessing a defense minimization challenge, courts generally draw a line at the two-or three-minute mark and exclude such short-duration calls from consideration.  *See, e.g.*, *United States v. Yarborough*, 527 F.3d 1092, 1098 (10th Cir. 2008) ("[C]onsistent with Supreme Court and Tenth Circuit precedent, in analyzing the reasonableness of the government's minimization efforts, we exclude calls under two minutes.");  *United States v. Homick*, 964 F.2d 899, 903 (9th Cir.1992) (court was reluctant to conclude that listening to all calls for two minutes or less irrespective of relevance violated minimization requirements); *Cleveland*, 964 F. Supp. at 1092-94  (excluding calls less than three minutes in duration).  *See also United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002) ("Following *Scott*, some courts have held that calls less than 2 minutes do not require minimization.  We certainly agree that minimization of short calls is not required.");  *United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir.1976) (monitoring all calls for a maximum of five minutes not unreasonable where interceptees frequently communicated in code and where discussions initially personal often turned later to criminal conduct).  Particularly in a case such as this one, the rationale for listening to the first two-three minutes of a conversation is that "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed."  *Scott*, 436 U.S. at 142.

Finally, even <u>if</u> this Court were to find that there was a failure to minimize some of the calls, the remedy should not be the suppression of <u>all</u> the intercepted conversations.  *See Cox*, 462 F.2d at 1301-1302; *United States v. Sisca*, 361 F. Supp735, 746-747 (S.D.N.Y. 1973); *United States v. Mainello*, 345 F. Supp. 863, 874-877 (E.D. N.Y. 1972).  Rather, at most what would be suppressed is any call that the Defendant has yet to identify and the Court were to conclude should have been minimized but was not.

(iv)    *The Investigators Complied With The Exhaustion Provisions Of Both*
        *Md. Code Ann. Cts. & Jud. Proc.§ 10-408(a)(1) And 18 U.S.C. §2518(3)(c).*

As noted, the investigation and wire authorizations in this case were conducted under the supervision of a judge from the Circuit Court for Harford County, the Honorable Angela Eaves. The exhaustion requirements of state law are identical to the requirements of federal law, and Maryland state court interpretations of the statutory requirements are also identical.  *See United States v. Bullock,* 203 F.3d 823,*4 (4th Cir. 2000) (unreported) ("Maryland's 'exhaustion' requirement is identical to federal wiretap law, and, thus whether we analyze this case under state or federal law is of little consequence.").   State and federal statutes include identical provisions regarding the requirement that all wiretap applications contain a statement regarding exhaustion of other investigative techniques.  Md. Code Ann., Cts. & Jud. Proc. § 10-408 (a)(1) and 18 U.S.C. § 2518 (1)(c).

Once again, considerable deference is to be given to the issuing judge's determination that the wiretap applications provided sufficient information to satisfy the exhaustion requirement of 18 U.S.C. § 2518(3) (c).   A district judge in reviewing the issuing judge's determination under 18 U.S.C. § 2518(3) (c) is to apply a common sense approach to that review.

Sections 2518 (1)(c) and (3)(c) of Title 18 were designed "to ensure that the relatively intrusive device of wiretapping was not routinely employed as the initial step in an investigation nor resorted to in situations where traditional investigative techniques would suffice to expose the crime."  *Smith,* 31 F.3d at 1297; *United States v. Kahn,* 415 U.S. 143, 153 n.12 (1974).  The Fourth Circuit has held that while wiretaps are an extraordinary investigative tool, they are also necessary tools of law enforcement and that § 2518(1)(c) should not be read in an overly restrictive manner.  *Leavis,* 853 F.2d at 220.  The Fourth Circuit has also repeatedly observed that,  "[T]he burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion'...that does not unduly hamper the investigative powers of law enforcement agents."  *Smith,* 31 F.3d at 1297, quoting *Clerkley,* 556 F.2d at 714.

The Government has never been required to show that other investigative methods have been wholly unsuccessful or that it has exhausted "*all* possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (emphasis in original); *Clerkley*, 556 F.2d at 709; *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989) (law enforcement official not required to exhaust all conceivable investigative procedures before seeking wiretap); *United States v. Bankston*, 182 F.3d 296, 306 (5th Cir. 1999), *rvs'd on other grounds* (exhaustion of every conceivable investigative option need not be shown); *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (wiretap necessary to learn full extent of drug operation despite attainment of degree of success with traditional investigative methods).

The language of § 2518(1)(c) is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Kahn*, 415 U.S. at 153, n.12, (1974). "These procedures were not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974). At the same time the purpose "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974). Nor need a wiretap be used only as a last resort. *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir. 1975). Rather, Congress intended that the showing envisioned by § 2518(1)(c) be tested "in a practical and common sense fashion." S. Rep. No. 1097, 1968 U.S. Code Cong. & Ad. News, p. 2190.

The Defendant argues that there was no need to intercept his phones because "investigative techniques in place were flourishing." Defendant's motion at 9. The affidavit in support of the wiretap, Exhibit 3 at 36-42, sets forth the investigative steps taken, tried but failed, or deemed to be too dangerous or unlikely to succeed if tried. For example, while confidential informants were able to make controlled buys from the Defendant, they did not and could not provide information as to the Defendant's source of supply. Indeed, it was only with the implementation of the wire, that investigators were able to identify the Defendant's source of

supply.  Likewise, physical surveillance of the Defendant proved problematic as his residence was in a gated community, also thereby making "trash runs" even more problematic.  Moreover, the Defendant's continued use of different rental cars each week made mobile surveillance difficult.

Courts have also held that, in assessing the need for a wiretap, affiants are authorized to rely upon, and courts are entitled to consider, their knowledge, training and experience as to whether a particular investigative technique will fail.  *See Smith*, 31 F.3d at 1299 (issuing court may take into account affirmations which are founded in part on experience of specially trained agents).  Furthermore, it is permissible for affiants to opine as to whether a particular procedure will succeed or fail.  *Clerkley*, 556 F.2d at 715 (reasonable conclusions about the productivity of certain techniques were sufficient to show need).

Judge Eaves, after having reviewed the affidavit in support of the request to wiretap the Defendant's phones, specifically found that "normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried or to be too dangerous."  Exhibit 4 at 2.  The Fourth Circuit has held that the appellate court owes "considerable deference" to the district court's determination that the exhaustion requirement of 18 U.S.C. § 2518(3)(c) was satisfied.  *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995); *Smith*, 31 F.3d at 1298 (declining to announce a standard of review but, after reviewing various standards applied in other circuits, holding that the standard should be one that gives the issuing judge's exhaustion determination "considerable deference").  *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (same).  Accordingly, Judge Eaves properly determined that the exhaustion requirement was satisfied and it should be accorded the highest degree of deference.

> (*v*) *The Wiretap Orders Were Not General Warrants In Violation Of The Fourth Amendment.*

The final Parthian dart hurled by the Defendant is that the wiretap orders constituted general warrants in violation of the Fourth Amendment.  The Defendant argues that the wiretap orders were flawed because they did not contain any "authorized objectives" but rather permitted

the agents to "keep searching until they felt they had enough evidence."  Defendant's motion at

10.  He further argues that the officers were given "unbridled authority to search, allotted in

thirty day increments," which "crossed the line by the Particularity Clause of the Fourth

Amendment and converted the surveillance into a general search."  *Id.*

     The problem with the Defendant's argument is that it overlooks or ignores that the

decision as to continue the use of electronic surveillance was not "discretionary" with law

enforcement.  Rather, it was Judge Eaves who determined whether continued electronic

surveillance was authorized.  Periodic progress reports were given to her every seven days.[5]

Judge Eaves read and reviewed those reports and then authorized the continued interceptions.

     Judge Eaves's orders also included explicit probable cause findings that the target

interceptees' communications would concern violations of Maryland Criminal Law Article CR

5-601 through CR 5-68 ("Controlled Dangerous Substances laws") and the orders listed eight

specific objectives that directly related to the investigation of those statutory violations.  Exhibit

4 at 1, 6.

     The Defendant also argues that the wiretap orders violated the Fourth Amendment's

particularity requirement.  The Fourth Amendment's particularity requirement prohibits the

issuance of a "general warrant" that does not contain a "particular description" of the things to be

seized.  *Andresen v. Maryland*, 427 U.S. 463, 480 (1976).  In *Andresen*, the Supreme Court

considered whether the particularity requirement was violated by a search warrant whose list of

documents to seize included a phrase, "together with other fruits, instrumentalities, and evidence

of crime at this [time] unknown."  427 U.S. at 479.  The Court noted that this phrase was "not a

separate sentence," but instead appeared at the end of a list of specific items.  *Id.* at 480.  The

Court concluded that the general phrase had to be read in the context of the preceding items, and

---

[5] Exhibit 7 is a representative example of the court reports filed with Judge Eaves.

that, when so read, the phrase clearly referred to other evidence of that particular scheme.  *See id.* at 480-81.[8]  On the basis of this reading, the Court held that the warrant was not impermissibly general.  *Id.*

In assessing the Defendant's challenges to Judge Eaves's order, there is an additional factor that must be considered–the very nature of electronic surveillance.  "A conversation, unlike physical evidence, cannot be described with precision, nor can it be immediately determined upon 'observing' it whether it is subject to the warrant or order."  *United States v. Dorfman*, 542 F. Supp. 345, 386 (N.D. Ill. 1982).  With these precepts in mind, it is clear that court's orders were not general warrants in violation of the Fourth Amendment.  The wiretap affidavits in this case set out the alleged offenses in considerable detail.  Judge Eaves's order must be read in connection with the affidavit.  The particularity requirement also is addressed by the order's requirements that monitoring be conducted in such a way as to minimize the interception of irrelevant communications.  Given these factors and the orders as a whole, they are not "general warrants."

---

[8] The Court in *Andresen* noted that the warrant it was considering – even with its catch-all phrase – contrasted sharply with the absence of particularity in  *Berger v. New York*, 388 U.S. 41 (1967), on which the Defendant relies.  *Andresen*, 427 U.S. at 481 n.10.  *Berger* involved a state eavesdropping statute that authorized surveillance "without requiring belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described."  Furthermore, the statute in that case provided authorization in 60-day increments, and extensions of this period on a showing merely that an extension was "in the public interest."  Congress enacted Title III to meet the constitutional requirements for electronic surveillance enunciated in *Berger* and *Katz v. United States* 389 U.S. 347 (1967).  *See Mitchell v. Forsyth*, 472 U.S. 511, 532 (1985).  The court's order here was issued pursuant to and fully compliant with Title III.  As such, the Defendant's *reliance* on *Berger* is misplaced.

*(vi).   Good Faith.*

Finally, even if this Court were to conclude that Judge Eaves's order was deficient, which it was not, the exclusionary rule does not apply when law enforcement acts in objectively reasonable reliance on a warrant later held invalid.  *See Davis v. United States*, 131 S. Ct. 2419, 29 (2011); *Leon*, 468 U.S. at 922.  In this case, the wiretap application, affidavit, and order were approved first by the State's Attorney for Harford County and then by Judge Eaves before interceptions were conducted.   Thus, even assuming *arguendo* that Judge Eaves's order constituted a "general warrant," the investigators acted in good faith reliance and suppression is not warranted.

As such, the affiants were entitled to rely on facially valid wiretap order that the resulting evidence would be admissible pursuant to the "good faith" exception of *Leon*.  *Leon* has been applied to admit electronic surveillance evidence.  *See United States v. Brewer*, 204 Fed. Appx. 205 *3 (4th Cir. 2006) (unreported) (even if affidavit lacked probable cause or exhaustion requirements had not been met, affiants were entitled to rely on facially valid wiretap order); *United States v. Moore*, 41 F.3d 370 (8th Cir. 1994) (good faith doctrine required that suppression of wiretap evidence be denied, despite defect in order allowing electronic surveillance).  Were the affidavit invalid, which the Government does not concede it was, the evidence may properly be received under the good faith exception to the exclusionary rule.

**(B)**     **Evidence Obtained By Court Authorized GPS Installation And Monitoring Was Lawful.**

The Defendant next complains about four GPS tracking orders: (1) an order dated April 30, 2013, authorizing GPS tracking devices on rental vehicles utilized by the Defendant; (2) an order dated May 8, 2013, authorizing a GPS tracking device on a 2004 Ford van registered to Charmaine Sharon Reid Coldiron; (3) an order dated May 26, 2013, authorizing a GPS tracking

device on a 2004 Dodge sedan registered to Warmington; and (4) an order dated June 11, 2013, authorizing a GPS tracking device on a 2004 Toyota Camry registered to Warmington.

With regard to the GPS orders involving the 2004 Ford van, the 2004 Dodge sedan and the 2004 Toyota Camry, the Defendant lacks standing to challenge the orders.  A defendant's right to challenge a search depends on his showing that governmental officials violated some legitimate expectation of privacy <u>he</u> held in the premises searched, and therefore his Fourth Amendment rights have in fact been violated.  *Rawlings v. Kentucky*, 439 U.S. 128 (1978).  *See also, United States v. Hargrove*, 647 F.2d 411, 412 (4th Cir. 1981) (one who can assert no legitimate claim to the car he was driving cannot reasonably assert an expectation of privacy in a bag found in that automobile); *United States v. Manbeck*, 744 F.2d 360, 373 (4th Cir. 1984) (privacy interest that must be established to support standing to challenge a search is an interest in the area searched, not an interest in the items found).  It is the Defendant's <u>burden</u> to establish that he has such standing.  *Rakas v. Illinois*, 439 U.S. 128, 130, n. 1 (1978); *United States v. Horowitz*, 806 F.2d 1222, 1224 (4th Cir. 1986).  The Fourth Circuit has noted, "[T]he thrust of the Fourth Amendment simply does not extend to locations lacking a foundation for reasonably expecting that the materials will be accorded privacy.  Exploration by the government although without a warrant of non-private places does not compel the suppression of evidence so obtained."  *United States v. Rampuran*, 632 F.2d 1149, 1153 (4th Cir. 1980).  If a defendant cannot make a showing that he had a reasonable expectation of privacy, the defendant cannot challenge the reasonableness of the search and seizure.  *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir. 1992).

Simply because the Defendant may have been driving one or more of the cars does not convey standing.  *See, e.g. United States v. Allen*, 235 F.3d 482 (10th Cir. 2000):

> Mr. Allen argues that the fact that the district court found that Mr. Allen was the person driving the car on the night in question is sufficient to prove standing.  In light of our prior holdings Mr. Allen's position is untenable.  Mere presence is not sufficient to show a legitimate possessory interest or lawful control over a vehicle... The fact that Mr. Allen was later shown to have had a legitimate possessory interest in the vehicle is not relevant to the question of whether Mr. Allen has met his burden at the suppression hearing.  As the proponent of the motion to suppress, Mr. Allen had the burden of proving he lawfully possessed the vehicle in order to show that he had a reasonable expectation of privacy in the vehicle.

*Allen*, 235 F.3d at 489.  *See also United States v. Arango*, 912 F.2d 441, 444 (10th Cir. 1990) (holding that the defendant's mere possession of the vehicle at the time of the search is not sufficient to give him standing to object to the search); *United States v. Erwin*, 875 F.2d 268, 271 (10th Cir. 1998) (defendant's possession of the car keys is not sufficient to give standing); *United States v. Sanchez,* 635 F.2d 47, 64 (2nd Cir. 1980) (possession of car keys not sufficient to give defendant a constitutionally protected interest in the privacy of the car).

In his motion to suppress, the Defendant has failed to provide even the barest proffer of facts that would support a claim that he possesses standing to object to the "search" of the vehicles by the installation of the GPS devices.  Accordingly, his suppression motion should be denied immediately and without a hearing as to the "GPS searches" of the vehicles.

Assuming, *arguendo* that somehow the Defendant can establish standing, he argues that the both the GPS affidavits[6] in support of the rental vehicles and the three vehicles registered to individuals other than the Defendant, are lacking in probable cause as no illegal activity was witnessed in or near any of the vehicles and that no evidence of a crime would be found in the particular movement of the vehicles.  Defendant's motion at 4.  Even the most cursory reading of the affidavits belies these claims.

---

[6] The "affidavits" are styled or captioned "Applications" by each of the detectives.  For simplicity sake with regard to the Government's response, the applications will be referred to as affidavits.

With regard to the April 30, 2013, affidavit seeking authorization to install GPS on rental vehicles utilized by the Defendant, the affidavit sets forth not only information from a confidential informant that two controlled purchases of narcotics were made from the Defendant but that in each instance, the Defendant drove to the meet location in rental cars, one rented from Dollar/Thrift, and the other from Avis. *See* Defendant's Exhibit A-1 at 2. The affidavit further details that the investigators confirmed with Dollar/Thrift that the Defendant for a two year time period, beginning in 2011 had been renting cars on a weekly basis. *Id.* The affidavit also sets forth that the affiant knows that drug dealers utilize motor vehicles to transport and sell illegal drugs, as well as travel by vehicles to meet their customers-a fact confirmed by the Defendant's use of two rental vehicles to sell narcotics to a confidential informant. All of this information led the issuing magistrate judge to conclude that probable cause existed that the Defendant was (1) engaged in narcotics trafficking and (2) there was reason to believe that the rental vehicles utilized by the Defendant were being used to facilitate the commission of drug offenses. *See* Defendant's Exhibit A-2 at 1.

With regard to the affidavits seeking the installation of a GPS on the 2004 Ford van, the 2004 Dodge sedan, and the 2004 Toyota Camry, none of which were registered to the Defendant, each of the affidavits detailed not just the information contained in the April 30, 2013 affidavit, but additional information relevant to each of the vehicles. *See* Defendant's Exhibit B-1 at 3 (Defendant observed operating Ford van during drug transaction); Defendant's Exhibit C-1 at 3 (following intercepted drug conversations, Defendant observed entering trunk compartment of Dodge sedan immediately following a drug transaction); and Defendant's Exhibit D-1 at 3-4 (intercepted drug conversations between the Defendant and Warmington confirm conspiracy; Defendant observed operating other vehicles owned by Warmington to facilitate drug distribution).

21

In reviewing a determination of probable cause, the trial court must accord "great deference" to the issuing judicial officer's finding of probable cause based on the facts submitted in the affidavit. *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990). The reviewing court must limit its inquiry to asking "only whether the magistrate had a 'substantial basis...for concluding' that probable cause existed." *Id.*, (quoting, *Illinois v. Gates*, 462 U.S. at 238-39. To find probable cause, the magistrate must simply "make a practical common sense decision whether, given all the circumstances in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*; *Massachusetts v. Upton*, 466 U.S. 727(1984) (probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched."). *See also, United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) (same). "Only the probability and not a *prima facie* showing, of criminal activity, is the standard of probable cause." *Blackwood*, 913 F.2d at 142, (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). Here the magistrate judges,[7] after reviewing the affidavits again made probable cause determinations that the Defendant had committed and was continuing to commit violations of laws related to controlled dangerous substances and that the subject vehicles were being used to facilitate the crime(s). *See e.g.* Defendant's Exhibit B-2 at 1.

Although the Defendant claims that the affidavits were so deficient that the officers could not rely on them in good faith, citing to *Leon,* 468 U.S. at 923, in point of fact at least two separate/different judges reviewed the affidavits and concluded that probable cause existed to install the GPS devices. In *Leon*, the Supreme Court held that the Fourth Amendment exclusionary rule does not bar the admission of evidence obtained by officers acting in

---

[7] The Defendant asserts it was the same detective and magistrate judge who authorized who issued <u>all</u> the orders, Defendant's motion at 2. In point of fact it was three different detectives and at least two different judges.

reasonable reliance on a search warrant which was issued by a detached and neutral magistrate but ultimately found to be invalid.  In reaching this conclusion, the Supreme Court emphasized that the standard for assessing the officer's good faith reliance on the magistrate's probable cause determination is one of objective reasonableness.  In the absence of an allegation that the magistrate abandoned his/her detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.  *United States v. Hyppolite*, 65 F.2d 1151, 1155 (4th Cir. 1995).  Notwithstanding the Defendant's assertion to the contrary, the magistrates did not abandon their roles, nor were the agents reckless or dishonest in their preparation of the affidavits in support of the GPS tracking devices.

Finally, the only vehicle that yielded any evidence that the Government intends to introduce at trial was the 2004 Ford van, registered to Charmaine Sharon Reid Coldiron.  A search warrant was obtained for that vehicle based on independent probable cause; *see* Exhibit 8 at 8-9 and a subsequent search resulted in the seizure of $70,945, concealed in a natural void in the vehicle.  Accordingly, Defendant's motion to suppress evidence obtained by or derived from GPS installation and monitoring should be denied.

### (C)   The Seizure Of All Tangible Evidence Was Proper.

The Defendant has filed a motion to suppress tangible evidence.  On June 14, 2013, investigators appeared before Harford County District Court Judge Mimi Cooper to obtain search warrants for the 2004 Ford van registered to Charmaine Sharon Reid Coldiron, the 2004 Dodge sedan and 2004 Toyota Camry registered to Warmington, as well as a warrant to search 4509 Lyons Run Circle, Apt. 303, Owings Mills, MD.  *See* Exhibit 8.[8]

---

[8]  The affidavit also listed other vehicles and residences of co-conspirators to be searched.

    (i)    *The Search Warrant Affidavit Provided Probable Cause To Issue the Search Warrants For the Defendant's Residence And The Vehicles.*

The Fourth Amendment protects all people against unreasonable searches and seizures and requires that all warrants authorizing a search or seizure must be supported by probable cause.  U.S. Const. Amend. IV.  In the case of drug dealers, a number of courts of appeals have held that evidence of involvement in the drug trade is likely to be found where the dealers reside. *See United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir.1999) (reasonable to suppose that drug dealer stored evidence of dealing at home, even though no drug trafficking was observed to occur there);  *United States v. Cruz*, 785 F.2d 399, 406 (2d Cir.1986) (probable cause for search of drug dealer's apartment, even though he was not seen using the apartment); *United States v. Hodge*, 246 F.3d 301, 304 (3rd Cir. 2001) (probable cause can be and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment, and the normal inferences about where a criminal may hide fruits of crime); *United States v. Williams*, 974 F.2d 480, 481-82 (4th Cir.1992) (totality of facts establishes fair probability that drug paraphernalia will be found in drug dealer's motel room);  *United States v. Davidson*, 936 F.2d 856, 859-60 (6th Cir.1991) (police had probable cause for the issuance of a search warrant since the affidavit revealed a substantial basis for concluding that a search of the defendant's residence would uncover evidence of wrongdoing); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir.1999) ("[I]n issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept ... and ... in the case of drug dealers evidence is likely to be found where the dealers live.") (quoting *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir.1996));  *United States v. Luloff*, 15 F.3d 763, 768 (8th Cir.1994) (observations of drug trafficking occurring away from the dealer's residence, coupled with officer's statement in his affidavit that drug dealers often store evidence of drug dealing in their residences, provided probable cause for search of dealer's house);  *United States v. Henson*, 123 F.3d 1226, 1239 (9th Cir.1997) ("In the case of drug dealers, evidence is likely to be found where the dealers live.") (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir.1986));  *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C.Cir.1993) (per curiam)

(observations of drug trafficking away from dealer's residence can provide probable cause to search the dealer's house).  *See also, United States v Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) (affidavit seeking a warrant to search a murder suspect's home need not contain any particular facts showing that the murder weapon is located in the home).

> The rationale underlying these cases is evidence associated with drug dealing needs to be stored somewhere, and that a dealer will have the opportunity to conceal it in his home.  After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold.

*United States v. Whitner* , 219 F.3d 289, 298 (3rd Cir. 2000).

The search warrant affidavit detailed that during the months of May and June 2013 both the Defendant and Warmington had been observed on several occasions leaving the Lyons Run Circle Apartment to conduct drug transactions.  Exhibit 8 at 5-6, 8-9.  Additionally, the affidavit set forth that not only did Miller and Warmington utilize the Ford van to conduct drug transactions, but that investigators had intercepted phone calls that led them to believe that drugs had been stored in the van.  Exhibit 8 at 11.

The search warrant was executed on June 22, 2013, and upon executing the search warrant at the Defendant's residence on Lyons Mill Circle, investigators located several items of evidentiary value including a loaded Glock 40 caliber handgun, a box of 40 caliber ammunition, cash, a box with rubber bands and written numbers,[9] narcotics, and digital scales.  Additionally, $70,945 was seized from the 2004 Ford van registered to an individual other than the Defendant. All of these items were lawfully seized pursuant to the search warrant and are admissible at trial against the Defendant.

---

[9] It is common for narcotics traffickers to bundle their money, commonly referred to as "stacks" in $1,000 increments and wrapped with rubber bands.  Packaging money in this fashion allows quick counting and exchange of money for drugs.

(ii)     *Even if Search Warrant Was Found To be Invalid, Agents Entitled To Rely On The Good Faith Exception.*

As a general matter, evidence obtained as a result of the execution of a search warrant that is not supported by probable cause need not be suppressed so long as the investigators acted in good faith.  Again, s*ee Leon*, 468 U.S. at 922-23.  Here, even if the Court were to conclude that the search warrant was not supported by probable cause, the Court should nevertheless reject the Defendant's motion to suppress evidence seized from the search warrant, because it plainly was reasonable for law enforcement officers to rely in good faith on the search warrant.

(iii)    *The Warrantless Search of the Defendant's Rental Vehicle On June 22, 2013 Was Lawful.*

Beginning on June 21, 2013, investigators intercepted a series of phone calls between the Defendant and his heroin source of supply, who resided in Pennsylvania.  In the calls the Defendant and his source of supply discussed meeting the next day in order for the Defendant to acquire a half kilogram of heroin.  The next day, June 22, 2013, investigators intercepted calls between the Defendant and a customer in Harford County making arrangements for the Defendant to sell the customer narcotics.  In addition, investigators also intercepted calls between the Defendant and the Pennsylvania heroin source of supply, indicating that the Defendant would be travelling to Pennsylvania to acquire the half kilo of heroin.  Based on the intercepted calls, and both electronic and physical surveillance investigators observed the Defendant arrive at the Lyons Run Circle apartment complex operating a 2013 Ford Fusion rental vehicle bearing Pennsylvania registration.[10]  As the Defendant drove into the apartment complex, he was arrested.  The Defendant began shouting "Everything is mine" and informed Warmington, who was in the vehicle with him, not to speak to the police and to "Plead the 5th." Once the Defendant had been removed from the vehicle, a certified narcotics K-9 alerted to the

---

[10] Throughout the investigation, investigators learned that when renting vehicles, the Defendant would seek to rent vehicles that were registered in states where he was travelling in an effort to avoid suspicion.

presence of narcotics near the rear driver's side door.   A subsequent search of the vehicle revealed a yellow Dollar General bag containing approximately 700 grams of suspected heroin. A field test was performed with a positive indication of heroin.

Once the alert occurred, there was not only "reasonable suspicion," but probable cause, to conduct a warrantless search of the vehicle.  *See, e.g. United States v. Place*, 462 U.S. 696, 707 (1983); *Florida v. Royer*, 460 U.S. 491, 506 (1983).  The Fourth Circuit has also held a positive alert for the presence of controlled substances by a trained K-9 provides probable cause for a search.  *United States v. Jeffus*, 22 F.3d  554, 556-57 (4th Cir. 1994) (use of drug dog not itself a "search, but fact that the dog "alerts" constitutes probable cause to search); *United States v. Carter*, 300 F.3d 415 (4th Cir. 2002) (positive "alert" at vicinity of trunk area of vehicle by K-9 dog provided probable cause to search trunk of car); *See also United States v. Allen*, 159 F.3d 832, 839 (4th Cir. 1998) (citing cases in other circuits).  Thus, on the basis of the K-9 alert on the vehicle for the presence of controlled substances, there was sufficient probable cause to search the vehicle.  *Jeffus*, *supra*.

The search of the rental vehicle, like Portia's mercy, was "twice blest."[11]  Not only did the K-9 scan of the rental vehicle provide probable cause for the search of the vehicle, but the Defendant's arrest upon being removed from the car for a narcotics offense served as a basis for a search of the vehicle, in accordance with "automobile exception," which provides that if a car is "readily mobile" and probable cause exists to believe, (as was the case here based of the drug activities of the Defendant, confirmed by the interception of calls between the Defendant and his heroin source of supply), that the vehicle contains contraband or evidence of a crime, then a warrantless search is permissible.  *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *United States v. Johnson*, 599 F.3d 339, 347 (4th Cir. 2010); *United States v.Kelly*, 592 F.3d 586,590 (4th Cir.

---

[11] The Merchant of Venice, Act IV, Scene 1.

2010); *United States v. White*, 549 F.3d 946, 949 (4th Cir. 2008).  *See also, Arizona v. Gant* 556 U.S. 332, 343 (2009) (warrantless search of vehicle permissible when driver arrested and reasonable to believe evidence relevant to the crime of arrest will be found in vehicle).

Finally, while not in the nature of tangible evidence, and for which no motion to suppress has been filed, the Government seeks to inform the Court of its intention to introduce statements made by the Defendant at the time of his arrest.  As indicated *supra.*, upon being arrested, but not in response to questioning, the Defendant shouted "Everything is mine."  Subsequently, the Defendant was advised of his *Miranda*[12] warnings and was questioned by investigators.  When asked about the ownership of the contents seized from inside the apartment at Lyons Run Circle, he stated that everything inside the apartment was his. When asked if he had any other monies or property other than what was seized from inside the apartment the Defendant stated he had no other money and did not live a lavish lifestyle, that he had no furniture and the investigators had gotten everything.  When asked if he was aware of the $70,945 seized from inside the 2004 Ford van, the Defendant placed his head down in his hands and began yelling "Bumbleclot"[13] repeatedly.

Defendant's initial statement was not made in response to questioning but rather constituted a blurt or volunteered statement for which *Miranda* is not implicated.  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980.  *Accord Estelle v. Smith*, 451 U.S. 454, 469 (1981); *United States v. Monteith*, 662 F.3d 660,669 (4th Cir. 2011); *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir.1993); and *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985).

With regard to the post arrest statements in response to questioning, having been advised of his *Miranda* warnings, the only remaining issue concerns the voluntariness of the Defendant's

---

[12] *Miranda v. Arizona,* 384 U.S. 436 (1966)

[13] Bumbleclot is a Jamaican patois expletive.

statements.   "A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause."   *United States v. Braxton,* 112 F.3d 777, 780 (4th Cir. 1997) (en banc).   For a statement to be involuntary under the Due Process Clause, it must be "extracted by ... threats or violence;" or "obtained by ... direct or implied promises" or "the exertion of ... improper influence."   *Braxton*, 112 F.3d at 780.   A statement following *Miranda* warnings is "rare[ly] be deemed involuntary," *Dickerson v. United States,* 530 U.S. 428, 444 (2000).

In determining voluntariness, the crucial inquiry in whether the subject's will has been "overborne" or his "capacity for self-determination critically impaired."   *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987).   *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *United States v. Photogrammetric Data Services*, 259 F.3d 229, 241-42 (4th Cir. 2001); *Braxton*, 112 F.3d at 781; and *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980).   The Court also examines "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview.   *United States v. Elie*, 111 F.3d 1135,1143-44 (4th Cir. 1997); *Pelton*, 835 F.2d at 1071.   *Accord United States v. Van Metre,* 150 F.3d 339, 348-49 (4th Cir. 1998). There has been no credible claim, nor can there be, that the Defendant's statements were not voluntary under the Fifth Amendment in violation of *Miranda*. Accordingly, his statements to the investigators are admissible.

**III**      **CONCLUSION**

For all of the above reasons the Government respectfully requests that the Defendant's pre-trial motions be denied.

Respectfully submitted,

ROD J. ROSENSTEIN
United States Attorney

By:      _____/s/_____
Christopher J. Romano
Assistant United States Attorney
36 S. Charles St., 4th Fl.
Baltimore, Maryland 21201

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this <u>27th</u> day of May, 2014, a copy of the foregoing Government's Response to Defendant's Pre-Trial Motions was electronically filed with notice to counsel of record:

_____/s/_____
Christopher J. Romano
Assistant United States Attorney